**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DESIREE DILLON, as parent** | ) | |
| **and as guardian of her** | ) | |
| **minor child, N.M.** | ) | |
| | ) | **Case No.:  4:19-cv-2775** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JUUL LABS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**PETITION WITH JURY DEMAND**</u>

Plaintiff, Desiree Dillon ("Plaintiff"), by and through her attorneys, brings this Petition against Defendant Juul Labs, Inc. ("JUUL" or "Defendant") and alleges as follows:

<u>**INTRODUCTION**</u>

1.      N.M. is the minor son of Plaintiff Desiree Dillon.  N.M. was a bright, athletic 16-year-old when he first tried JUUL, an e-cigarette designed and manufactured by Defendant to create and sustain nicotine addiction.  Now, at 17 years old, N.M. is severely addicted to nicotine and suffering from ongoing issues with his lungs as a result of Defendant's wrongful conduct in marketing, promoting, designing, manufacturing, distributing, and selling JUUL products.

2.      In 2015, PAX Labs, Inc. set out to reinvent the image of cool by creating JUUL, the iPhone of e-cigarettes.   While the public health community was experiencing one of the lowest levels of youth smoking in decades, JUUL recognized a tremendous opportunity to take advantage of regulatory loopholes and inaction for e-cigarettes and create a new generation of young nicotine addicts who would become customers for life.

3.      JUUL's design was perfect for teenagers.  The JUUL device was purposely designed to not look or feel like a cigarette.  It is a sleek, high-tech youth-friendly battery-powered device that looks like a USB drive.  The JUUL device heats a nicotine-filled liquid JUULpod, sold separately in fun flavors like mango and cool mint.  Unlike cigarette smoke, the JUUL vapor is nearly undetectable when exhaled.  JUUL is small, easy to transport and hide, and can be used practically anywhere without parents or teachers knowing; Googling "hiding JUUL in school" or "how to ghost rip JUUL" returns hundreds of videos on how to JUUL anywhere without detection.  This is part of the appeal, fostered and bolstered by JUUL's viral marketing campaigns using young models to make the products look cool and stylish.

4.      Nicotine is one of the most addictive chemicals in the world.  JUUL designed its e-cigarettes to yield a physiological response and degree of "satisfaction" exceeding those of even traditional cigarettes.  The nicotine salt formulation of JUUL's proprietary vapor liquid, JUULsalts™, was intentionally designed, engineered, patented, and adopted by JUUL to deliver high concentrations of nicotine, along with aerosol and other toxic chemicals into the lungs, body and brain, while mitigating adverse taste and maintaining palatability.

5.      JUUL designed its products to eliminate any "throat hit" or irritation that would serve as a natural deterrent to new users.  The sole purpose of this design element was to initiate new smokers, since those who already smoke cigarettes are tolerant to the throat hit sensation and associate it with smoking and nicotine satisfaction.  JUUL also designed its device to deliver substantially higher concentrations of nicotine per puff than traditional cigarettes and most other e-cigarettes.  This combination of high nicotine delivery and ease of inhalation makes JUUL both powerfully addictive and dangerous.

6.     Nicotine is particularly dangerous to young people whose brains are still developing through age 25.   Nicotine is not only addictive, but also induces seizures and it permanently alters the structure of the brain.  Nicotine causes permanent mood changes and other cognitive disorders.  Furthermore, adolescent nicotine use can increase risk for future addiction to other drugs.[1]  The United States Surgeon General has concluded that e-cigarettes, including JUUL, are not safe for anyone under age 26.[2]

7.     Although e-cigarettes are particularly unsafe for anyone under age 26, JUUL promoted its products to young people.  JUUL borrowed from big tobacco's playbook, in concert with its advertising agencies, to develop a product and marketing strategy that portrayed its e-cigarette as trend-setting, stylish, and fun.  In addition to ads eerily similar in scheme and content to those of traditional cigarette manufacturers, JUUL took advantage of social media, the lifeblood of American middle and high school kids, to surreptitiously reach the youth market.  In particular, JUUL enlisted the services of social media "influencers" – social media personalities with large followings – to promote JUUL's products.  JUUL utilized marketing strategies and imagery that preyed on teen vulnerabilities to create life-long customers and generate billions of dollars in revenue, without warning youth about the serious risks of addiction and other permanent injuries.

8.     JUUL created an epidemic of nicotine addiction among adolescents in the United States.  E-cigarette use in general increased 78% among high school students and 48% among middle school students in a single year from 2017 to 2018. The FDA Commissioner

---

[1] Surgeon General's Advisory on e-Cigarette Use Among Youth, U.S. Centers for Disease Control and Prevention (2018) https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf (as of August 16, 2019).
[2] U.S. Surgeon General and the U.S. Centers for Disease Control and Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019) https://e-cigarettes.surgeongeneral.gov/ (as of August 16, 2019).

called these results "astonishing."  The Secretary of the U.S. Department of Health and Human

Services, Alex Azar, recently stated at a press conference: "We have never seen use of any

substance by America's young people rise as rapidly as e-cigarette use is rising."[3]

## THE PARTIES

9.      Plaintiff Desiree Dillon resides in Phelps County, Missouri and was, at all

relevant times, a resident of the State of Missouri.

10.     Plaintiff is the parent and natural guardian of N.M., a minor who became

addicted to nicotine and suffered other injuries as alleged herein, as a result of using

Defendant's vaping products.

11.     Defendant JUUL, is a Delaware corporation, having its principal place of

business in San Francisco, California.

12.     JUUL originally operated under the name PAX Labs, Inc. In 2017, it was

renamed JUUL Labs, Inc.

13.     JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-

cigarettes and related products, including through sales at physical retail locations across the

United States and internet sales through websites maintained by JUUL.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the matter of this action pursuant to 28 U.S.C.

§ 1332.  The amount in controversy exceeds $75,000 exclusive of interest and costs, and this is

---

[3] *Surgeon General Releases Advisory on E-Cigarette Epidemic Among Youth*, U.S. Department of Health & Human Services (December 18, 2018) https://www.hhs.gov/about/news/2018/12/18/surgeon-general-releases-advisory-e-cigarette-epidemic-among-youth.html (as of August 16, 2019).

an action by an individual Plaintiff against a Defendant who are each citizens of different states.

13.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     This court has personal jurisdiction over Defendant because it does business in the District of Missouri and has sufficient minimum contacts with this District.  Defendant intentionally avails itself of the markets through the promotion, marketing, and sale of the products at issue in this lawsuit to render the exercise of jurisdiction by this Court permissible under Missouri law and the U.S. Constitution.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

**The Creation of JUUL**

16.     According to JUUL's website, the brief version of JUUL's origin story is that:

Adam Bowen and James Monsees co-founded JUUL Labs when they applied their background in product design to the challenge of finding a true alternative to smoking.  They had been smokers for many years, but when they could find no acceptable alternative to cigarettes, Adam and James recognized a groundbreaking opportunity to apply industrial design to the smoking industry, which had not materially evolved in over one hundred years.  ***As smokers, they knew a true alternative to cigarettes would have to offer a nicotine level found in no other alternative on the market.***  It would also have to invite its own ritual.  The result was JUUL.[4]

---

[4] JUUL Website, *Our Story*, https://www.juul.com/our-story (as of September 5, 2019)(emphasis added).

17.     Bowen and Monsees were on a quest to "make tobacco cool again."[5] According to Monsees, they were on a mission to "deliver solutions that refresh the magic and luxury of the tobacco category."[6]  In order to accomplish their goal, Monsees and Bowen looked to the past successes of big tobacco and borrowed the industry's playbook.  Monsees has publicly admitted that JUUL consulted cigarette industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the cigarette industry, governmental officials, and injured smokers. "[Industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries.  And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[7]

18.     In 2015, JUUL launched its current design.  Knowing it needed a product design that would avoid the stigma associated with smoking traditional cigarettes and ultimately appeal to youth, JUUL's revamped product resembled a device commonly found at schools and in backpacks across the country: a USB flash drive.  JUUL's e-cigarettes are small enough to fit in the user's hand—making it easier to conceal their use by, for example, students—and come in stylish designs and colors.

19.     Each JUUL e-cigarette has two components.  First, the e-cigarette, which holds the battery and temperature regulation system.  The thin, rectangular e-cigarette is made up of an aluminum shell, a battery, a magnet for the USB-charger, a circuit board, an LED light, and

---

[5] Freedman, D., *How Do You Sell a Product When You Can't Really Say What it Does?*, Inc. (May 2014). https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html (as of August 16, 2019).
[6] Mings, J., *Ploom Model Two Slays Smoking with Slick Design and Heated Tobacco Pods*, Solid Smack (April 23, 2014) https://www.solidsmack.com/design/ploom-modeltwo-slick-design-tobacco-pods/ (as of August 16, 2019).
[7] Montoya, G., *Pax Labs: Origins with James Monsees*, Social Underground (January 2015) https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (as of August 16, 2019).

a pressure sensor.  Second, a pod, marketed as "JUULpods," which contain 0.7 milliliters of JUUL's patented liquid made up of nicotine, glycerol and propylene glycol, benzoic acid, and flavorants.  The pod is inserted into the end of the e-cigarette device.  When the device senses the movement of air, *i.e.*, the user sucking air through it, the liquid is then heated up, creating a vapor, which quickly dissolves into the air.  JUUL describes the e-cigarettes as an "easy to use vaporizer."  Unlike the distinct odor produced by cigarette smoke, the odor emitted from a JUUL e-cigarette is a reduced aerosol.  Like its sleek, stylish design, the lack of a potent odor enables users to conceal their use and avoid the stigma of being a smoker of traditional cigarettes.

20.     The physical design of the JUUL device (including its circuit board) and JUUL pod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, JUUL precisely controls the amount of nicotine vapor delivered.  One study determined that there is a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."  Another study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."

21.     In addition to its physical design that is appealing to youth and easily concealed, JUUL developed a new way of delivering nicotine, by mixing nicotine with a chemical called benzoic acid.  The result is a quicker and stronger delivery of nicotine, which more closely resembles a traditional cigarette.  But, medical researchers say it also makes JUUL's product more addictive for youth.  And nothing in JUUL's e-cigarettes limits the amount of nicotine each puff delivers to that of a cigarette.

**JUUL Designed its Product to Deliver Extremely Potent Concentrations of Nicotine, Thus Increasing the Risk of Nicotine Addiction**

22.     JUUL's US patent No. 9,215,895 (the "'895 patent") details how "certain nicotine salt formulations provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."[8]  The patent states: "the peak concentration of the nicotine in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette".

23.     To illustrate its claims, JUUL submitted charts with its '895 patent to show that its nicotine salts with a 4% benzoic acid solution closely match the amount of nicotine delivered into the bloodstream by a Pall Mall cigarette:



24.     However, consistent with JUUL's deceptive practices, JUUL has understated the concentration of nicotine its product delivers.  Studies have shown that JUUL e-cigarettes contain higher levels of benzoic acid and nicotine than JUUL represents.  Specifically, rather

---

[8] U,S. Patent No. 9,215,895 (filed Oct. 10, 2014) https://patents.google.com/patent/US9215895B2/en (as of September 5, 2019).

than the 4% benzoic acid solution disclosed in JUUL's patent paperwork, JUUL products have been found to have a benzoic acid solution upwards of 4.5%.[9]  Likewise, the same study revealed that a single JUULpod contains approximately 6% nicotine or 60 mg/mL of nicotine per JUULpod.[10]  JUUL represents that each JUULpod contains 5% or 50 mg/mL.

25.     By manipulating the concentration of benzoic acid, JUUL is able to increase the potency of the nicotine salts in its JUULpods.  JUUL deviates from the '895 patent formulation and manufactures a product that causes dangerously high amounts of nicotine to be absorbed into the bloodstream.  This results in a product that creates an unprecedented risk for nicotine addiction.

**JUUL's Marketing Intentionally Targeted Youth**

26.     In its marketing and advertising, JUUL took a page out of the big tobacco playbook and marketed its products to the youth demographic.  As described above, Monsees admitted that JUUL studied tobacco industry documents.  In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."[11]

27.     JUUL's early marketing was nicknamed "Vaporized" and depicted flirtatiously posed young people holding JUULs.  JUUL's print advertisements mimicked those of big tobacco and traditional cigarettes, including colorful ad images using eye-catching designs and

---

[9] Pankow, James F., et al, *Benzene Formation in Electronic Cigarettes*, PLoS ONE (March 8, 2017) https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173055 (as of September 5, 2019).
[10] *Id*.
[11] Robert K. Jackler, M.D. et al, JUUL Advertising Over Its First Three Years on the Market (Jan. 21, 2019) (the "Stanford Report") http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (as of August 16, 2019).

youth-oriented imagery touting themes of being "cool," "carefree," "stylish," "attractive," "sexy," "pleasureful," "popular" and that the JUUL e-cigarettes are "great tasting."

28.     JUUL's marketing campaign also included attractive young people distributing free JUULs at movie and music events.

29.     JUUL pods came in sweet flavors including mango, fruit medley, cool mint, cool cucumber and crème brulee.  At times, JUUL introduced some of its flavors as "limited edition" to create increased demand and an image of exclusivity.  According to one survey, 81% of current youth e-cigarette users cited the availability of appealing flavors as the primary reason for use.[12]

30.     In addition to print ads, JUUL tapped in to the lifeblood of the American teenager: social media.  JUUL recognized and tapped into the power of social media in influencing the lives and habits of today's middle and high school kids.  On social media platforms, JUUL also employed social media influencers with sizable followings to increase its exposure amongst youth and to make its product look cool and glamorous. [13]

31.     JUUL's social media influencers would post youth-targeted advertising, often featuring images of young people JUULing, with JUUL's hashtags such as #JUUL, #JUULvapor, #switchtoJUUL, #vaporized.  Viral marketing campaigns pushed JUUL's products on children, teens, and young adults.

32.     In 2016, JUUL made a few changes to its marketing, but the deception and intent to target youth remained.  For instance, JUUL's marketing would often depict themes

---

[12] FDA, *Vaporizers, E-Cigarettes, and Other Electronic Nicotine Delivery Systems (ENDS)*, https://www.fda.gov/tobacco-products/products-ingredients-components/vaporizers-e-cigarettes-and-other-electronic-nicotine-delivery-systems-ends (as of August 16, 2019).
[13] Robert K. Jackler, M.D. et al, JUUL Advertising Over Its First Three Years on the Market (Jan. 21, 2019) (the "Stanford Report") http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (as of August 16, 2019).

like socialization and romance or style and identity.  Instagram and Facebook ads included photos of pop-star Katy Perry with a JUUL at the Golden Globes.

33.     But it wasn't until recently that JUUL's advertisements started to include the adult smokers JUUL claimed it was targeting to switch from traditional cigarettes to JUUL. Despite these changes, the JUUL hashtags continue to thrive in viral peer-to-peer teen promotion. [14]  According to Robert K. Jackler, who has extensively studied tobacco industry advertising, "Once [JUUL] lit the match, it took off like wildfire.  The fact that Juul shut down its own social media postings had little effect".[15]

34.     JUUL's social media, youth-focused marketing worked.  A 2018 study found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18.[16]  The National Youth Tobacco Survey has found that 78.2% of middle and high-school students - 20.5 million youth - had been exposed to e-cigarette advertisements.[17]  JUUL launched in June 2015 and its sales reached $1 million by December 2015.[18]  In 2017, JUUL's revenues grew by 700%.[19]  JUUL now controls 72% of the e-cigarette market.[20]

---

[14] Belluz, J., *The Vape Company Juul Said it Doesn't Target Teens.  Its Early Ads Tell a Different Story.*, Vox (January 25, 2019) https://www.vox.com/2019/1/25/18194953/vape-juul-e-cigarette-marketing (as of August 16, 2019).

[15] Neilson, S., *Juul Doesn't Need to Advertise to Young People.  Everyone Else is Doing it For Them.*, NPR (July 3, 2019) https://www.npr.org/sections/health-shots/2019/07/03/738209356/juul-doesnt-need-to-advertise-to-young-people-everyone-else-is-doing-it-for-them (as of August 16, 2019).

[16] Chu, et al, *JUUL: Spreading Online and Offline*, Journal of Adolescent Health 63 (2018) 582-586, https://www.jahonline.org/article/S1054-139X(18)30358-6/pdf (as of August 16, 2018).

[17] American Cancer Society, *Report: More and More Teens Seeing E-Cigarette Ads*, (March 19, 2018) https://www.cancer.org/latest-news/report-more-and-more-teens-seeing-e-cigarette-ads.html (as of August 16, 2019).

[18] Richtel, M. and Kaplan, S., *Did Juul Lure Teenagers and Get 'Customers for Life'?*, New York Times (August 27, 2018) https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (as of August 16, 2019).

[19] Levy, A., *E-Cigarette Maker Juul is Raising $150 Million After Spinning Out of Vaping Company*, CNBC (December 19, 2017) https://www.cnbc.com/2017/12/19/juul-labs-raising-150-million-in-debt-after-spinning-out-of-pax.html (as of August 16, 2016).

[20] Richtel, M. and Kaplan, S., *Did Juul Lure Teenagers and Get 'Customers for Life'?*, New York Times (August

**JUUL Failed to Warn About the Dangers of Nicotine**

35. Despite JUUL's high visibility on social media and advertisements, very few JUUL ads prior to 2017 had any type of nicotine warning,

36. To the extent that JUUL used nicotine or addiction warnings in advertisements, they were hardly noticeable in fine print against low contrast backgrounds.



37. It is also noteworthy that JUUL did not add nicotine warnings to its packaging until 2018, despite numerous revisions to its packaging since 2015.

38. These fine print warnings were insufficient to put potential consumers on notice of the addictive nature of JUUL's products and the dangers inherent in nicotine use. Likewise, JUUL's warnings did not convey to potential consumers that JUUL's products deliver nicotine

27, 2018) https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (as of August 16, 2019).

in far higher concentrations than in conventional combustible cigarettes, thus amplifying the danger of nicotine addiction.

39.     Nicotine causes permanent brain changes and damage.  The neurological effects of nicotine exposure for youth and young adults include addiction, reduced impulse control, deficits in attention and cognition and mood disorders.

40.     Nicotine is also associated with cardiovascular, reproductive, and immunosuppressive problems, and it is also a carcinogen.  Nicotine can also cause seizures. Other than its use as a stimulant, the only other known use of nicotine is as an insecticide.

**JUUL Created a Youth Vaping Epidemic**

41.     The FDA now characterizes teen vaping as an epidemic.  Indeed, smoking remains the leading cause of preventable death in the U.S., killing more than 480,000 people a year.  Each year, cigarette smoking causes about one in every five deaths in the U.S.[21]  If smoking were to continue at the current rate among U.S. youth, 5.6 million of today's Americans under the age of 18 years are anticipated to die prematurely from a smoking-related illness.[22]  This represents about one in every 13 Americans aged 17 years or younger who are alive today.[23]

42.     According to a recent survey of adolescent drug use, 20.9% of 12th graders, 16.1% of 10th graders, and 6.1% percent of eighth graders had vaped nicotine in the previous 30 days.[24]  According to the Centers for Disease Control and Prevention ("CDC"), in 2017

---

[21] CDC, *Smoking & Tobacco Use Fast Facts*,
https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/index.htm (as of August 16, 2019).
[22] *Id*.
[23] *Id*.
[24] Stein, B., *Teen Vaping Soared in 2018*, NPR (December 17, 2018) https://www.npr.org/sections/health-shots/2018/12/17/676494200/teen-vaping-soared-in-2018 (as of August 16, 2018).

2.1 million high-schoolers and middle schoolers used e-cigarettes.[25]  That number rose by 1.5 million in 2018.[26]  E-cigarette use increased 78% among high school students and 48% among middle school students from 2017 to 2018.[27]  As CDC Director Dr. Robert R. Redfield explains: "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made reducing tobacco use.  It's putting a new generation at risk for nicotine addiction."[28]

43.     JUUL's e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teen users.  Nicotine is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.

44.     Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys.  Exposure to nicotine produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders.  Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoking.  Vaping also triggers immune responses associated with inflammatory lung diseases.

45.     A study conducted by the American Journal of Medicine found that among young adults who did not smoke cigarettes, those who use e-cigarettes were more than four times as likely than non-vapers to start smoking traditional cigarettes within 18 months.[29]

---

[25] CDC, *Youth and Tobacco Use*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (as of August 16, 2019).
[26] *Id.*
[27] FDA, *2018 NYTS Data: A Startling Rise in Youth E-Cigarette Use*, https://www.fda.gov/tobacco-products/youth-and-tobacco/2018-nyts-data-startling-rise-youth-e-cigarette-use (as of August 16, 2019).
[28] CDC, *Progress Erased: Youth Tobacco Use Increased During 2017-2018*, https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html (as of August 16, 2019).
[29] Truth Initiative, *JUUL E-Cigarettes Gain Popularity Among Youth, But Awareness of Nicotine Presence Remains Low*, (April 18, 2018) https://truthinitiative.org/press/press-release/juul-e-cigarettes-gain-popularity-among-youth-

Evidence also suggest that nicotine can affect an adolescent's neurological development and that when adolescents are exposed to nicotine they are subjected to an increased risk of nicotine addiction.[30]  According to the National Institutes of Health, the "amount and speed of nicotine delivery … plays a critical role in the potential for abuse of tobacco products."[31] JUUL's e-cigarettes are the most potent on the market.[32]

**JUUL's Actions Resulted in Plaintiff's Injuries**

46.    Plaintiff's son N.M. was 16 years-old when he started using JUUL products in 2018.  N.M. was first introduced to JUUL products through friends and was immediately drawn to the fruit flavors and thought that vaping with Defendant's JUUL products looked cool.

47.    Before trying JUUL, N.M. had never used combustible cigarettes or other tobacco products and believed that smoking is gross.  N.M. would not have been drawn to use JUUL products if they did not come in fun, fruity flavors.

48.    At school, N.M. was in an environment where the use of e-cigarettes was pervasive and he was constantly inundated with exposure to JUUL advertisements in stores and online.

49.    Nothing in JUUL's advertisements or packaging that N.M. was exposed to ever made him aware of the dangerous levels of nicotine in JUUL products or that they carried any

---

awareness-nicotine-presence (as of August 16, 2019).

[30] *Know the Risks E-Cigarettes and Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html (as of August 16, 2019).

[31] *See How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Centers for Disease Control and Prevention (2010) https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92 (as of August 16, 2019).

[32] Perrone, M., *Juul Nicotine Hit May Be 'Worst for Kids, Best for Smokers'*, AP News (April 27, 2019) https://www.apnews.com/681b934cc43147ed8026dd8fdb1dae56 (as of August 16, 2019).

serious health risks.  N.M. would not have used JUUL products if he had known of the serious

health and addiction risks.

50.     N.M. quickly became addicted to nicotine as a result of using JUUL's products

and is unable to fight his addiction.

51.     When N.M. tries to go without using JUUL products, he suffers withdrawal

symptoms and becomes uncharacteristically angry and irritable.  This anger and irritability

have led to fighting within the family and N.M. has also been suspended for fighting at school.

52.     In addition to N.M.'s nicotine addiction, using JUUL products has also had

other tremendous negative impacts on N.M.'s health.  Before using JUUL products, N.M. was

healthy and athletic.  Now, N.M. is unable to play sports because of ongoing issues with his

lungs and lack of stamina.

53.     N.M. has also been admitted to a hospital after his lungs filled with fluid and he

started coughing up blood.  The issues with N.M.'s lungs have been ongoing and he has

frequent, painful coughing spells.  Due to N.M.'s lung issues, he is seeing a pulmonologist to

help diagnose and treat the problems.

54.     Plaintiff has incurred thousands of dollars in medical expenses due to N.M.'s

ongoing health issues and nicotine addiction that resulted from N.M. using JUUL products.

These issues are ongoing and Plaintiff anticipates that N.M. will suffer more injuries as a result

of using JUUL products.  Plaintiff has also had to take time off work to help N.M. with his

frequent illnesses and trips to the doctor.

55.     Plaintiff has been directly and proximately harmed by Defendant's unlawful

conduct as alleged in this Petition.  Such harm includes N.M.'s nicotine addiction, respiratory

illnesses, and exposure to toxic substances which may cause or contribute to causing diseases

and long-term health issues.  N.M. would not have purchased or used JUUL products had he known the true facts.

56.     As a result of the injuries caused by JUUL, Plaintiff has incurred and will continue to incur significant medical and other expenses to sustain and/or fight N.M.'s nicotine addiction, frequent illnesses, pain and suffering, and emotional distress.

## CAUSES OF ACTION

### COUNT I
### PRODUCTS LIABILITY – DESIGN DEFECT

57.     Plaintiff incorporates by reference the preceding paragraphs of this Petition as if fully set forth herein.

58.     Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL e-cigarettes and JUULpods, which Defendant intended to be used as means to ingest nicotine and the other aerosolized constituents of JUUL's nicotine solution.

59.     Defendant knew or, by the exercise of reasonable care, should have known that JUUL's products were harmful or injurious under ordinary use, particularly to youths and adolescents, including N.M..

60.     As described herein, Defendant designed and marketed its products to appeal to nonsmokers, youths and adolescents.

61.     Defendant expected its product to be used by consumers without substantial change to the condition in which it was designed, developed, manufactured, marketed, and sold.

62.     N.M. used Defendant's JUUL products for the purpose and in the manner that was reasonably foreseeable or intended by Defendant.

63.     Defendant's product is inherently defective because JUUL products deliver significantly more nicotine than Defendant represents.  In addition, Defendant's JUUL products are unreasonably dangerous in that they also cause significant exposure to nicotine and other toxic substances which may cause or contribute to causing nicotine addiction, seizures, mood disorders, psychological issues, cardiovascular issues, and lung illnesses.  The risks inherent in the design of JUUL outweigh significantly any benefits of such design.

64.     At all relevant times, Defendant could have employed reasonably feasible alternative designs to prevent the harms discussed herein.

65.     Defendant could have designed its JUUL products in such a way that was less likely to appeal to youth and other people not already addicted to nicotine.  For example, Defendant could have not offered fun, novelty flavors or not designed its JUUL device to light up in flashy rainbow colors when waived around.

66.     At all relevant times, N.M. was unaware of the design defects described herein. Further, Defendant knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products nor the long-term complications that nicotine addiction presents.  Defendant also knew or had reason to know that youths and adolescents, due to their inexperience and/or immaturity of judgment, would recklessly disregard such risks.

67.     As a result of Defendant's conduct, Plaintiff was harmed as described herein.

68.     The defect(s) in Defendant's products was a substantial factor in causing Plaintiff's injury.

## COUNT II
## PRODUCTS LIABILITY – MANUFACTURING DEFECT

69.     Plaintiff incorporates by reference the preceding paragraphs of this Petition as if fully set forth herein.

70.     Defendant's JUUL product labels represent that JUULpods contain 50 mg/mL, or 5% nicotine.

71.     Defandant's '895 patent states that JUULpods are intended to contain 4% benzoic acid by weight.

72.     Defendant manufactures JUULpods that contain more than 50 mg/mL of nicotine.

73.     Defendant manufactures JUULpods that contain more than 4% benzoic acid by weight.

74.     As a result of Defendant's manufacturing defects, the extreme risk of nicotine addiction and other issues related to nicotine exposure presented by JUUL's vaping products is heightened beyond the already existing extreme addiction risks that Defendant's JUUL products posed.

75.     These defects were a substantial factor in Plaintiff's injury.


## COUNT III
## PRODUCTS LIABILITY – FAILURE TO WARN

76.     Plaintiff incorporates by reference the preceding paragraphs of this Petition as if fully set forth herein.

77.     Defendant manufactured, distributed and sold and promoted JUUL e-cigarettes, or have partnered to manufacture, distribute, sell and promote JUUL.

78.     At all times relevant, Defendant was well-aware of the dangers of nicotine addiction as described herein.

79.     At all times relevant, N.M. was not aware of and would not have recognized the risks of using a JUUL e-cigarette with a JUULpod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

80.     The product warnings Defendant displays on JUUL's packaging and/or on JUUL's website were inadequate in that they fail to inform potential users that JUUL contains levels of nicotine that vastly exceed the nicotine levels found in common combustible cigarettes and that JUUL's nicotine delivery system makes it more likely that users will become addicted to nicotine or develop other psychological and health issues.

81.     The defects in JUUL's products, including the lack of adequate warnings, existed at the time the JUULpods and devices were sold and/or when the JUULpods and devices left JUUL's possession or control and rendered JUUL's products unreasonably dangerous.

82.     JUUL's e-cigarettes and JUULpods were anticipated to be used by N.M. without substantial change in their condition from the time of their manufacture or sale.

83.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with JUUL products, Plaintiff and N.M. would have avoided the risk of developing injuries as alleged herein.

84.     As a result of Defendant's failure to adequately warn and/or instruct, Plaintiff was harmed as described herein.

85.     The defect(s) in Defendant's products was a substantial factor in causing Plaintiff's injury.

**COUNT IV**
**NEGLIGENCE**

86.     Plaintiff incorporates by reference the preceding paragraphs of this Petition as if fully set forth herein.

87.     Defendant, directly or indirectly, caused JUUL products to be purchased and/or used by Plaintiff.

88.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

89.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products.  Defendant owed a duty of care to consumers and the general public, including a duty to provide accurate, true, and correct information concerning the risks of using JUUL and appropriate, complete, and accurate warnings concerning the potential adverse effects of nicotine use and, in particular JUUL's patented nicotine salts and the chemical makeup of JUULpods liquids.

90.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of JUUL products and specifically, the health hazards posed by continued use of nicotine, particularly among adolescents.

91.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of JUUL e-cigarettes and

JUULpods could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including N.M..

92.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products including but not limited to the risk of continued nicotine use and nicotine addiction.

93.     As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its JUUL e-cigarettes and JUULpods, in that Defendant manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

94.     Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant failed to do so.  Indeed, Defendant wrongfully concealed information and made further false and/or misleading statements concerning the safety and/or use of JUUL products and nicotine vaping.

95.     Defendant's negligence included:

  a.    Manufacturing, producing, promoting, formulating, creating,   developing, designing, selling, and/or distributing its JUUL products without thorough and adequate pre- and post-market testing;

  b.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not JUUL products were safe for their intended use;

    c.       Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of JUUL products so as to avoid the risk of serious harm associated with the prevalent use of JUUL products and nicotine;

    d.       Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use its JUUL products;

    e.       Failing to disclose to Plaintiff, users, consumers, and the general public that the use of JUUL products presented severe health risks including nicotine addiction;

    f.       Representing that its JUUL products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

    g.       Declining to make or propose any changes to JUUL products' labeling or other promotional materials that would alert the consumers and the general public of the risks of JUUL products and nicotine vaping;

    h.       Advertising, marketing, and recommending the use of JUUL products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of JUUL products and nicotine;

    i.       Continuing to disseminate information to its consumers, which indicate or imply that Defendant's JUUL products are not unsafe for their intended use; and

    j.       Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

96.    Defendant knew and/or should have known that it was foreseeable that users, such as N.M., would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

97.    N.M. did not know the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods liquids.

98.     Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

99.     Defendant's conduct, as described above, was reckless.  Defendant regularly risks the lives of consumers and users of its products, including N.M., with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including N.M.  Defendant's reckless conduct therefore warrants an award of aggravated or punitive damages.

100.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective JUUL products into the stream of commerce without adequate warnings of their hazardous  nature, Plaintiff was harmed as described herein.

101.    Defendant's negligence was a substantial factor in causing Plaintiff's injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief:

1.      Award Plaintiff compensatory damages in an amount to be determined at trial;

2.      Award Plaintiff punitive damages in an amount to be determined at trial;

3.      Award reasonable attorneys' fees and costs, as provided for by law; and

4.      Grant any such further and other relief as the Court deems just and proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,


/s/ Thomas P. Cartmell
Thomas P. Cartmell, MO #45366
Jonathan P. Kieffer, MO #49025
Tyler W. Hudson, MO #53585
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, MO  64112
Tel. (816) 701-1100
Fax (816) 531-2372
tcartmell@wcllp.com
jpkieffer@wcllp.com
thudson@wcllp.com


/s/ Kirk J. Goza
Kirk J. Goza, MO #32475
Brad Honnold, MO #39818
Goza & Honnold LLC
9500 Nall Ave., Suite 400
Overland Park, KS  66207
Tel. (913) 451-3433
kgoza@gohonlaw.com
bhonnold@gohonlaw.com

Attorneys for Plaintiff